[Cite as *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, 2013-Ohio-5036.]
# IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

Hope Academy Broadway Campus et al.,    :

       Plaintiffs-Appellants/    :
       Cross-Appellees,                 No. 12AP-496

                         :         (C.P.C. No. 10CVC-05-7423)

v.                                                                        :         (REGULAR CALENDAR)

White Hat Management, LLC et al.,

                                                                 :

       Defendants-Appellees/
       Cross-Appellants.         :

---

# D E C I S I O N

### Rendered on November 14, 2013

---

*Dinsmore & Shohl LLP*, and *Karen S. Hockstad*; *Shumaker, Loop & Kendrick, LLP, James D. Colner*, and *Adam M. Galat*, for plaintiffs-appellants/cross-appellees.

*Taft, Stettinius & Hollister LLP, Charles R. Saxbe, Donald C. Brey*, and *James D. Abrams*, for defendants-appellees/cross-appellants.

*Jones Day*, *Chad A. Readler*, and *Kenneth M. Grose*, Amicus Curiae Ohio Coalition for Quality Education.

*Michael DeWine*, Attorney General, and *Todd R. Marti*, Amicus Curiae Ohio Department of Education.

---

APPEAL from the Franklin County Court of Common Pleas.

BROWN, J.

{¶ 1}  Hope Academy Broadway Campus, Hope Academy Chapelside Campus, Hope Academy Lincoln Park Campus, Hope Academy Cathedral Campus, Hope Academy University Campus, Hope Academy Brown Street Campus, Life Skills Center of Cleveland, Life Skills Center of Akron, Hope Academy West Campus, and Life Skills Center Lake Erie

("the schools"), plaintiffs-appellants/cross-appellees, appeal the judgment of the Franklin County Court of Common Pleas, in which the court granted partial summary judgment in favor of White Hat Management, LLC, WHLS of Ohio, LLC ("WHLS"), HA Broadway, LLC, HA Chapelside, LLC, HA Lincoln Park, LLC, HA Cathedral, LLC, HA University, LLC, HA Brown Street, LLC, LS Cleveland, LLC, LS Akron, LLC, HA West, LLC, and LS Lake Erie, LLC (referred to as a singular entity "White Hat"), defendants-appellees/cross-appellants. The Ohio Department of Education ("ODE") and the Ohio Coalition for Quality Education have filed amicus briefs. White Hat has filed a motion to dismiss for lack of a final, appealable order.

{¶ 2} The schools are the governing boards of ten community schools. In November 2005, each of the schools entered into similar management agreements with separate education management organizations ("EMO"). The EMOs are owned by WHLS. The EMOs receive assistance from White Hat Management. The White Hat EMOs manage and operate the schools. The management agreements provide for certain payments from the schools to White Hat. The schools paid White Hat a fixed percentage of the per-student state funding they received, called a "continuing fee," as well as full reimbursements for federal and state grants. White Hat was responsible for the day-to-day operation of the schools, including the purchasing of furniture, computers, books, and all other equipment. White Hat also was responsible for providing a building and staff for the schools.

{¶ 3} The management agreements terminated on June 30, 2007, but the parties renewed them for one-year terms in 2007-2008, 2008-2009, and 2009-2010. As of the time of briefing, of the ten original subject schools, two Hope Academies had closed, and the three Life Skills Centers were under different management.

{¶ 4} On May 17, 2010, the schools filed an action against White Hat and ODE, seeking declaratory relief, injunctive relief, and an accounting alleging claims of breach of contract and breach of fiduciary duty. In general, the schools asserted that, pursuant to the terms of the management agreements, they were entitled to all property purchased by White Hat using public funds without having to pay White Hat for such property. After the action was filed, the parties executed a series of "standstill agreements," which

permitted the parties to continue operations as if the management agreements were still in effect.

{¶ 5} On February 21, 2012, the schools filed a motion for partial summary judgment, claiming they were entitled to all property, without payment to White Hat, that White Hat purchased using public funds to operate the schools. On May 11, 2012, the trial court granted the schools partial summary judgment, finding that the schools are entitled only to the personal property purchased by White Hat using funding sources that required the purchase to be in the schools' names pursuant to the terms of the management agreements. The trial court also found that White Hat had no fiduciary duty to give property to the schools without compensation. The schools appeal the trial court's decision, asserting the following assignments of error:

> [I.] The trial court erred when it found that White Hat owns certain personal property under the terms of the Management Agreements and that the Schools must purchase the property from White Hat at the expiration of the Management Agreements.
>
> [II.] The trial court erred in declaring that the Schools have legal authority to transfer title to personal property under R.C. Chapters 3313 and 3314.
>
> [III.] The trial court erred in limiting the nature of White Hat's fiduciary relationship to the Schools.

{¶ 6} We first address White Hat's motion to dismiss for lack of a final, appealable order. Pursuant to Ohio Constitution, Article IV, Section 3(B)(2), this court's appellate jurisdiction is limited to the review of final orders of lower courts. "A final order * * * is one disposing of the whole case or some separate and distinct branch thereof." *Lantsberry v. Tilley Lamp Co.*, 27 Ohio St.2d 303, 306 (1971). A trial court's order is final and appealable only if it satisfies the requirements of R.C. 2505.02 and, if applicable, Civ.R. 54(B). *Denham v. New Carlisle*, 86 Ohio St.3d 594, 596 (1999), citing *Chef Italiano Corp. v. Kent State Univ.*, 44 Ohio St.3d 86, 88 (1989).

{¶ 7} When determining whether a judgment or order is final and appealable, an appellate court engages in a two-step analysis. First, the court must determine if the order is final within the requirements of R.C. 2505.02. Second, if the order satisfies R.C. 2505.02, the court must determine whether Civ.R. 54(B) applies and, if so, whether the

order contains a certification that there is no just reason for delay. *Gen. Acc. Ins. Co. v. Ins. Co. of N. Am.*, 44 Ohio St.3d 17, 21 (1989). Civ.R. 54(B) does not alter the requirement that an order must be final before it is appealable. *Id.*, citing *Douthitt v. Garrison*, 3 Ohio App.3d 254, 255 (9th Dist.1981).

{¶ 8} R.C. 2505.02 defines a final order and provides several definitions. Pursuant to Civ.R. 54(B), a trial court may separate one or more claims from other pending claims for purposes of appellate review. *Ohio Millworks, Inc. v. Frank Paxton Lumber Co.*, 2d Dist. No. 14255 (June 29, 1994). The claims separated must otherwise have been finally adjudicated. *Id.* If the trial court expressly determines that there is no just reason for delay, then the claim or claims separated, pursuant to Civ.R. 54(B), may be reviewed on appeal even though other claims remain pending. *Id.*

{¶ 9} In the present case, White Hat's only real argument is that the trial court's order did not adjudicate all of the parties' claims, and the trial court did not indicate there was no just reason for delay. It is true that the trial court did not adjudicate all claims in this multiple-claim action; thus, there could be no final judgment with regard to either claim absent the "no just reason for delay" language from Civ.R. 54(B). In the original decision, the trial court made no determination that there was no just reason for delay. However, the schools filed a motion for Civ.R. 54(B) certification with respect to the trial court's judgment, which the trial court granted on July 24, 2012. Therefore, we find the judgment was both a final and appealable order. White Hat's motion to dismiss is denied.

{¶ 10} The schools argue in their assignments of error that the trial court erred when it granted partial summary judgment in favor of White Hat. Summary judgment is appropriate when the moving party demonstrates that: (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the non-moving party, and that conclusion is adverse to the non-moving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, L.L.C.*, 192 Ohio App.3d 521,

2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 11} When seeking summary judgment on the ground that the non-moving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the non-moving party has no evidence to prove its case. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the non-moving party has no evidence to support its claims. *Id.* If the moving party meets its burden, then the non-moving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *Id.* If the non-moving party does not so respond, summary judgment, if appropriate, shall be entered against the non-moving party. *Id.*

{¶ 12} The present case involves the reading and interpretation of contracts between the parties. In construing the terms of a written contract, our primary objective is to give effect to the intent of the parties, which is presumed to rest in the language they have chosen to employ. *Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635, 638 (1992). Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph two of the syllabus. Where the terms are clear and unambiguous, a court need not go beyond the plain language of the instrument to determine the rights and obligations of the parties. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (1989). Where possible, a court must construe the agreement to give effect to every provision in the agreement. *In re All Kelley & Ferraro Asbestos Cases*, 104 Ohio St.3d 605, 2004-Ohio-7104, ¶ 29. Moreover, the construction of a written contract is a question of law, which we review de novo. *Id.* at ¶ 28.

{¶ 13} Here, the schools argue in their first assignment of error that the trial court erred when it found that White Hat owns certain personal property under the terms of the

management agreements and that the schools must purchase the property from White Hat at the expiration of the management agreements. The pertinent language in the agreements is found in three sections of the agreements: Sections 2, 8, and 12. Section 2 provides, in pertinent part:

> b. Equipment:
>
> i. The Company shall purchase or lease all furniture, computers, software, equipment, and other personal property necessary for the operation of the School. Additionally, the Company shall purchase on behalf of the School any furniture, computers, software, equipment, and other personal property which, by the nature of the funding source, must be titled in the School's name.

{¶ 14} Section 8 provides, in pertinent part:

> 8. Fees.
>
> a. Management, Consulting and Operation Fee. The School shall pay a monthly continuing fee (the "Continuing Fee") to the Company of Ninety Six Percent (96%) of the revenue per student received by the School from the State of Ohio Department of Education pursuant to Title 33 and other applicable provisions of the Ohio Revised Code (the "Code") plus any discretionary fees paid under the discretionary bonus program identified in Paragraph 8.c. (the "Qualified Gross Revenues"). Qualified Gross Revenues do not include: Student fees, charitable contributions, PTA/PTO Income and other miscellaneous revenue received which shall be retained by the School or PTA/PTO. Federal Title Programs, lunch program revenue and such other federal, state and local government grant funding designated to compensate the School for the education of its students shall be fully paid to the Company.
>
> i. Payment of Costs. Except as otherwise provided in this Agreement, all costs incurred in providing the Educational Model at the School shall be paid by the Company. Such costs shall include, but shall not be limited to, compensation of all personnel, curriculum materials, textbooks, library books, computer and other equipment, software, supplies, building payments, maintenance, and capital improvements required in providing the Educational Model. It is understood that at the School's election, upon termination of this Agreement all personal property used in the operation of the School and owned by the Company or one of its affiliates and used in the

operation of the School, other than proprietary materials owned by the Company, may become the property of the School free and clear of all liens or other encumbrances upon the School paying to the Company an amount equal to the "remaining cost basis" of the personal property on the date of termination.

ii.  Property Owned by the School. The property purchased by the School shall continue to be owned by the School.

{¶ 15} Section 12 provides, in pertinent part:

c. Equipment and Personal Property. On or before the Termination Date, and after the payment of the "remaining cost basis" to be made by the School in accordance with Section 8 (a), herein the Company shall transfer title to the School, or assign to the School the leases (to the extent such leases are assignable), for any and all computers, software, office equipment, furniture and personal property used to operate the School, other than the Company's proprietary materials. Other than said proprietary materials, the School shall own said personal property and the rights under any personal property lease assigned from the Company to the School.

{¶ 16} The trial court concluded that Section 8(a)(i) provided that White Hat would buy and own all personal property, with the single exception of any property required by the funding source to be purchased in the names of the schools. For all personal property bought and owned, the trial court found, the schools would have to pay White Hat.

{¶ 17} The schools argue that the agreements were ambiguous with respect to the ownership rights to property purchased with the continuing fee, as it is unclear when White Hat was required to act as the schools' purchasing agent. The schools argue there were at least the following two interpretations as to when White Hat had to act as the schools' purchasing agent: (1) the schools' interpretation – White Hat acted as the schools' purchasing agent with respect to any property purchased with the continuing fee, and (2) White Hat's and the trial court's interpretation – White Hat sometimes acted as the schools' purchasing agent in undefined circumstances.

{¶ 18} With regard to the first interpretation – that White Hat acted as the schools' purchasing agent with respect to any property purchased with the continuing fee – the

schools contend that Section 2(b)(i) clearly indicates that White Hat was required to act as the schools' purchasing agent when the property was required to be titled in the schools' names due to the nature of the funding source. The schools argue that the "nature" of the funding source is meant to differentiate between public and private funding. The schools point to Section 8(a) to assert that ODE was one funding source, and the federal, state, and local governments that provided grant funding were other funding sources, and the common characteristic shared by these funding sources listed in Section 8(a) was that they are all public entities. Thus, the schools contend, as Section 8(a) relates to Section 2(b)(i), the "funding sources" underlying the continuing fee were public in nature. Accordingly, White Hat was obligated to act as the schools' purchasing agent for any property purchased with the continuing fee, and all such property purchased with the continuing fee was owned by the schools.

{¶ 19} With regard to the second interpretation, which was advocated by White Hat and adopted by the trial court – that White Hat sometimes acted as the schools' purchasing agent in certain circumstances – the schools contend that neither the trial court nor White Hat explained when White Hat would be obligated to act as the schools' purchasing agent. The schools point out that White Hat's position is that it owns all property purchased with the continuing fee, as funds received in the form of the continuing fee convert from public funds to private funds, relying upon the language in Section 8(a)(i). The schools claim that White Hat's and the trial court's reading of the agreements fails because: (1) White Hat's obligation to "pay costs" under Section 8(a)(i) is irrelevant to the ownership rights of property because under Section 2(b)(i) White Hat was required to make purchases, or "pay costs," for property purchased on behalf of the schools, (2) White Hat's reading would render meaningless Section 2(b)(i), which recognizes instances when White Hat was to act as the schools' purchasing agent based upon the nature of the funding source, and the schools are public schools that receive their funding from public sources, and (3) the repurchase provision in Section 8(a)(i) applies only to property used in the operation of the schools and owned by White Hat, so White Hat's reliance on that section presupposes that White Hat already owns the property, which is the center of the current dispute.

{¶ 20} In its appellate brief, White Hat argues simply that White Hat is a purchasing agent for the schools in one very limited situation: when a funding source requires property to be titled in the schools' names. White Hat contends that, in all other circumstances, White Hat bought the property with its own money and is the sole owner of that property.

{¶ 21} After reviewing the plain language of the agreements, we find the terms of the agreements, when read as a whole, are not ambiguous. The schools own only that property that must be titled in the schools' names due to "the nature of the funding source." Section 2(b)(i). The language as used in the agreements does not support the schools' interpretation that White Hat acted as the schools' purchasing agent with respect to all property purchased with the continuing fee because the fee originated from a "public" funding source. Presumably the bulk of White Hat's purchases to execute its educational model for each school come from that school's continuing fee and grant funding. Thus, under the schools' interpretation of the agreements, they would be entitled to virtually all of the property purchased by White Hat to execute its educational model, as the schools believe they are entitled to all property purchased with the continuing fee and any grant funding. However, it is apparent from Sections 2(b)(i), 8(a)(i), and 12(c) that the agreement contemplates that White Hat will purchase property to execute its educational model and will own certain of that property. Thus, that the agreements contemplate that White Hat will own property it purchases strongly suggests that the schools' interpretation that they should own virtually all of the property is incorrect.

{¶ 22} Although the schools might counter that the property that White Hat owns is that property paid for with its "own" money, this attempted distinction reveals the flaw in the schools' overall theory. Under the schools' theory, White Hat's "own" money used to pay for property apparently must derive from earnings gained in the business of managing schools. However, presumably these earnings derive, at least in significant part, from the continuing fee paid to it by various schools – both those schools in the present case, as well as others. Thus, at some point, the continuing fee paid to White Hat must convert to White Hat's private monies with which it may then purchase its "own" property. The schools neglect to define precisely when the continuing fee paid to White Hat loses its public character and becomes White Hat's private income. Pursuant to the

schools' theory, the monies from the continuing fee must never convert to White Hat's "own" private monies anytime during the effective terms of the agreements; that is, the continuing fee payments are always public funds as long as the parties are operating under the agreements or any extension of the agreements. The schools fail to present any authority for such an expansive definition of public funds. Therefore, the schools' contention that the continuing fee paid to White Hat is still public funds, even after it is paid to White Hat, has logical failings.

{¶ 23} Indeed, as White Hat points out, this court has explicitly found that once public funds are paid to a private entity, they lose their public character. In *State ex rel. Yovich v. Bd. of Edn. of Cuyahoga Falls City School Dist.*, 10th Dist. No. 91AP-1325, (June 23, 1992), a school psychologist, who worked at a non-public school through its contract with a private corporation, filed an action seeking a declaration that the board of education had a duty to make employer contributions to the State Teachers Retirement System ("STRS") for him. The board claimed that, although it was obligated to provide psychological services to pupils with funds appropriated by the state of Ohio, the psychologist was an employee of a private corporation and was not a teacher. In seeking STRS contributions, the psychologist argued, in relevant part, that the board paid him with public funds. On appeal, we rejected the psychologist's public funds argument, concluding:

> Finally, appellant urges that * * * he was paid from public funds while working for [the private corporation]. While public funds were appropriated initially to pay for the type of services performed by appellant, the funds lost their chief characteristic of "public funds" once the funds came into possession and control of CSO, a private entity. The hallmark of public funds is that such money belongs to the state or a subdivision of government. The appellant in this case was paid by a private corporation whose funds were not controlled or held by the board. We, therefore, reject the contention that appellant was paid with public funds.

{¶ 24} Our holding in *Yovich* is applicable to the present circumstances. Although the monies White Hat used to pay for property were once public funds, at the time of the purchases, the monies used to pay for the property were in the possession and control of White Hat, a private entity. White Hat could decide how and whether to spend the money,

and the board no longer had any control over or possessory interest in the monies. Therefore, consistent with *Yovich*, we agree that the continuing fees the schools paid to White Hat using public funds lost their chief characteristic of public funds once the funds came into possession and control of White Hat, a private entity.

{¶ 25} Accordingly, if the funds White Hat used to pay for the property were private funds, then the meaning of the language in Sections 2, 8, and 12 is clear. Section 8(a)(i) provides that White Hat must pay for all property used in the education of the students, and the schools may purchase any property owned by White Hat upon termination of the agreement. Section 2(b)(i) explains which property White Hat owns. Section 2(b)(i) requires White Hat to purchase on behalf of the schools only that property that, by nature of the funding source, must be titled in the schools' names. Because White Hat's private funds do not require the property purchased with them be titled in the schools' names, the property purchased with White Hat's private funds is owned by White Hat. Following this logic to its end, pursuant to Section 12(c), White Hat must then transfer title in the property to the schools after the schools' payment under Section 8(a)(i).

{¶ 26} We disagree with the schools' contention that ambiguity in the agreements is illustrated by the trial court's finding that the parties must refer to some unspecified funding source "requirements" outside the agreements to determine each party's property rights and the court's failure to explain how the parties should determine whether the funding source required the purchase of property in the schools' names. The schools present no authority for the proposition that a contract cannot reference a defined variable outside of the contract. To be sure, contractual language is ambiguous if a court cannot determine its meaning from the four corners of the contract. *See Covington v. Lucia*, 151 Ohio App.3d 409, 2003-Ohio-346, ¶ 18 (10th Dist.). However, contracts are not invalid simply because they depend upon an outside source to supply a contract term. *See, e.g.*, *State ex rel. Ohio Atty. Gen. v. Tabacalera Nacional S.S.A.*, 10th Dist. No. 12AP-606, 2013-Ohio-2070, ¶ 20 (finding that the case was not one involving a contract that named a specific outside source to give meaning to a particular term, like a term in a variable rate loan that refers to a rate set by an outside source to calculate the rate for the loan); *Arlington Hous. Partners, Inc. v. Ohio Hous. Fin. Agency*, 10th Dist. No. 10AP-764, 2012-

Ohio-1412, ¶ 36 (variable terms that will fluctuate with an independently set index are a common and enforceable component of many types of contract). Here, the terms of the agreements are explicit in requiring property to be titled in the schools' names only if the source of the funds requires purchases made with them to be titled in the names of the schools. Whether a funding source requires purchases made with them to be titled in the name of the school is not an uncertain variable capable of varying interpretations but, rather, a definite term to provide meaning to the terms of the agreements. Despite the schools' attempt to deconstruct the agreements with ambiguity, the intent and meaning of the agreements, specifically Section 2(b)(i), are clear here.

{¶ 27} The schools next argue that because of the uncertainties and ambiguities in the contract, the trial court was required to resolve them in a way that makes the agreements fair and reasonable, and the trial court's finding was against public policy. The schools contend that it was unfair to find that White Hat owned all of the property it bought with the continuing fee because White Hat was already earning substantial income from the continuing fee and was not entitled to earn even more in the form of property ownership.

{¶ 28} Initially, we reject the schools' unfounded argument that it would be unfair to find that White Hat owned all of the property it bought with the continuing fee because White Hat was already earning substantial income from the continuing fee and was not entitled to earn even more in the form of property ownership. The schools fail to cite any authority for the proposition that White Hat is somehow precluded from earning "even more" by keeping any property it purchased even though it was also earning income from the continuing fee. There is no case law we are aware of that caps a private entity's level of income based upon the sole nebulous reason of it being "unfair." If the contracts entered into by the parties here permitted White Hat to purchase and own private property using its own income, including income derived by the continuing fee, then we see no inherent unfairness in such an agreement. We also fail to see why property retained by White Hat spending the continuing fee should be treated any differently than earnings retained by White Hat not spending the continuing fee. If it is not unfair for White Hat to retain the unspent continuing fee as profit, it should not be unfair for White Hat to retain property purchased with the continuing fee.

{¶ 29} With regard to the schools' claim that we must interpret the agreements in such a way that makes them fair and reasonable, that rule of contract is only implicated when a contract is susceptible to two interpretations. *See GLIC Real Estate Holdings, LLC v. Bicentennial Plaza Ltd.*, 10th Dist. No. 11AP-474, 2012-Ohio-2269, ¶ 10 (where a contract is susceptible of two constructions, we must employ the construction that makes the agreement fair and reasonable and gives the agreement meaning and purpose). Where contractual language is unambiguous, we must apply that language as written without resort to methods of construction or interpretation, and we may not, in effect, create a new contract by finding an intent not expressed by the clear language. *See Cleveland Constr., Inc. v. Kent State Univ.*, 10th Dist. No. 09AP-822, 2010-Ohio-2906, ¶ 29. Therefore, in the present case, as we have found the language in the agreements is unambiguous, we do not resort to this rule of contract.

{¶ 30} The schools next argue that the trial court ignored the absence of statutory authority for community schools to transfer property for the benefit of a private entity. Furthermore, the schools contend that the trial court misinterpreted R.C. 3314.04 and 3313.41. R.C. 3313.41 provides rules that boards of education must follow when disposing of real or personal property that it owns in its corporate capacity. R.C. 3314.04 provides:

> Except as otherwise specified in this chapter and in the contract between a community school and a sponsor, such school is exempt from all state laws and rules pertaining to schools, school districts, and boards of education, except those laws and rules that grant certain rights to parents.

{¶ 31} White Hat counters that the schools were exempt from "all state laws pertaining to" traditional public schools, except as noted in R.C. 3314.04; thus, the schools' contention that they do not have authority to pass title of personal property to White Hat is invalid. White Hat also asserts that the schools' argument that it cannot dispose of the property is premised on the notion that the schools owned the property in the first place. White Hat points out that the schools' own records do not reference or account for the personal property it claims to own, White Hat purchased all of the property in dispute with its own money and not any grant money, and the contracts did not specify that White Hat was buying property on behalf of the schools.

{¶ 32} The trial court found that the schools operate under R.C. 3314.04 and that section exempts them from all state laws and rules that apply to traditional schools, school districts, and boards of education, except for those laws and rules that grant certain rights to parents. The court concluded that, because R.C. 3313.41, upon which the schools rely, does not grant any rights to parents, it does not fall under the exception in R.C. 3314.04.

{¶ 33} We agree with the trial court. As White Hat points out, the schools' argument that R.C. 3313.41 limited its ability to dispose of property is grounded upon the presupposition that it owned the property in question in the first place. As we have already found, the schools did not own the property. Notwithstanding this finding, we would still reject the schools contention. Although the schools again attempt to create ambiguity with the language used in R.C. 3314.04, we find it clear. As the trial court found, R.C. 3314.04 exempts community schools from all laws and rules that apply to traditional schools, except for those relating to the rights of parents. As R.C. 3313.41 does not relate to the rights of parents, the schools are exempt from that rule and it does not impose any limits on its disposal of property. We find no reason to read anything more complicated into this plain language. Thus, this argument is without merit. Therefore, for all of the above reasons, the schools' first assignment of error is overruled.

{¶ 34} The schools argue in their second assignment of error that the trial court erred in declaring that the schools have legal authority to transfer title to personal property under R.C. Chapters 3313 and 3314. The schools' argument under this assignment of error closely tracks the final argument addressed under the schools' first assignment of error above. The schools contend that, as public entities created by statute, they may take only those actions specifically authorized by statute, and they must pursue the proper statutory method of disposing of its property. The schools maintain that nothing in community school legislation authorizes property transfers with respect to community schools; thus, they are barred from selling or transferring property.

{¶ 35} However, the schools' arguments are again based upon the notions that the schools owned the property bought by White Hat with monies that were paid to it as the continuing fee and that the property was purchased with public funding. As we have found, the schools never owned the property, and the property was not purchased with

public funding. Instead of transferring property to White Hat, the schools paid money to White Hat, which then bought property using the income generated from the continuing fee. There has never been any exchange of the property in question here. Therefore, this argument is without merit, and the schools' second assignment of error is overruled.

{¶ 36} The schools argue in their third assignment of error that the trial court erred by limiting the nature of White Hat's fiduciary relationship to the schools. " 'A "fiduciary relationship" is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.' " *Stone v. Davis*, 66 Ohio St.2d 74, 79 (1981), quoting *In re Termination of Employment*, 40 Ohio St.2d 107, 115 (1974). The term "fiduciary" is defined as "a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." (Emphasis omitted.) *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 16. A fiduciary relationship may be created by contract or an informal relationship where both parties understand that a special trust or confidence has been reposed. *Id.*, citing *Umbaugh Pole Bldg. Co., Inc. v. Scott*, 58 Ohio St.2d 282, 287 (1979).

{¶ 37} Here, the trial court found that a formal general fiduciary relationship was not created by the agreements. The court found that the parties dealt with each other at arm's length in a commercial context, and the parties' relationship was not created informally but, rather, by execution of 16-page contracts that specifically provided that the contracts were not to be construed as creating a partnership of joint venture between the parties. The court did find that the agreements created a limited fiduciary duty on the part of White Hat to use its best efforts to assist the schools in obtaining assignments of existing leases under the same terms and conditions and left open the possibility that a general fiduciary relationship was created by the conduct of the parties.

{¶ 38} The schools contend that White Hat was barred from taking title to the property even if the schools had authority to pass it because White Hat is both a public official and a fiduciary barred from taking pecuniary gain in performing a public contract. In support, the schools cite *State v. McKelvey*, 12 Ohio St.2d 92, 95 (1967), in which the Supreme Court of Ohio held that a public official is a fiduciary, and a public official cannot use his position for private profit, as it would be a violation of this duty to the citizens of

the state for an official to use his public office for private gain. However, such precedent " 'was established, and has typically been applied, in the context of public officials who engaged in some sort of financial misconduct, such as using their public office for private gain or misappropriating funds in contravention of express statutory duties.' " *Cristino v. Bur. of Workers' Comp.*, 10th Dist. No. 12AP-60, 2012-Ohio-4420, ¶ 19, quoting *State ex rel. Cook v. Seneca Cty. Bd. of Commrs.*, 175 Ohio App.3d 721, 2008-Ohio-736, ¶ 32 (3d Dist.). Such is not the case here. Here, the "private gain" resulting from White Hat's ownership in the property was not due to financial misconduct but from the expenditure of the corporation's own income derived from formerly public funds. The schools have not cited any authority for the proposition that the fiduciary duty of public officials extends to a community school management company's purchase of goods with private corporate income generated from continuing fees, and we decline to extend the law in this manner to create such a duty when the agreements specifically indicated that the parties did not intend to create a partnership or joint venture and termed White Hat an independent contractor. *See*, *e.g.*, *Nilavar v. Osborn*, 127 Ohio App.3d 1, 20 (2d Dist.1998) (parties to a joint venture owe each other fiduciary duties, such as a duty of full disclosure and a duty against self-dealing); *Schulman v. Wolske & Blue Co., L.P.A.*, 125 Ohio App.3d 365 (10th Dist.1998) (under Ohio law, there is generally no fiduciary relationship between an independent contractor and his employer unless both parties understand that the relationship is one of special trust and confidence).

{¶ 39} In addition, a fiduciary relationship cannot be unilateral. *Applegate v. Fund for Constitutional Govt.*, 70 Ohio App.3d 813, 817 (10th Dist.1990). "A party's allegation that he reposed a special trust or confidence in an employee is insufficient as a matter of law to prove the existence of a fiduciary relationship without evidence that both parties understood that a fiduciary relationship existed." *Schulman* at 372, citing *Lee v. Cuyahoga Cty. Court of Common Pleas*, 76 Ohio App.3d 620, 623 (8th Dist.1991). In the present case, the schools failed to produce any evidence showing that White Hat, which was an independent contractor under the agreement, entered into any mutual fiduciary relationship with the schools. Although we agree every contract contains an implied duty for the parties to act in good faith and to deal fairly with each other, *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 2005-Ohio-4850, ¶ 27, there was no formal general fiduciary duty

created by the agreements that required White Hat to purchase and hold property for the schools' benefit. For these reasons, the schools' third assignment of error is overruled.

{¶ 40} Accordingly, the schools' assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Motion to dismiss denied;*
*judgment affirmed.*

**TYACK and McCORMAC, JJ., concur.**

**McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of the Ohio Constitution, Article IV, Section 6(C).**

_____