[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.,* Slip Opinion No. 2015-Ohio-3716.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2015-OHIO-3716

HOPE ACADEMY BROADWAY CAMPUS ET AL., APPELLANTS, *v.* WHITE HAT MANAGEMENT, L.L.C., ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.,* Slip Opinion No. 2015-Ohio-3716.]

*Community schools—R.C. Chapter 3314—"Operator, defined—Management company that undertakes daily operation of community school has fiduciary relationship with school—Contract clause requiring schools to buy back equipment purchased by operator when purchase was made with public money is enforceable.*

(No. 2013-2050—Submitted September 23, 2014—Decided September 15, 2015.)

APPEAL from the Court of Appeals for Franklin County, No. 12-AP-496, 2013-Ohio-5036.

_____

**SYLLABUS OF THE COURT**

1. An entity that manages the daily operations of a community school pursuant to contract with the school's governing authority is an operator within the meaning of R.C. 3314.02(A)(8)(a).

2. A management company that undertakes the daily operation of a community school has a fiduciary relationship with the community school that it operates.

3. The fiduciary relationship between an operator and its community school is implicated when the company uses public funds to purchase personal property for use in the school that it operates.

_____

**LANZINGER, J.**

## I.    Introduction

{¶ 1} This contract dispute is a portion of ongoing litigation initiated by appellants,[1] the governing boards of ten Cleveland community schools, commonly called "charter schools," collectively ("the schools"). The defendants-appellees are private for-profit companies White Hat Management, L.L.C., and WHLS of Ohio, L.L.C., and ten subsidiary companies ("the companies")[2] that operated and managed the schools (collectively, "White Hat") pursuant to contracts with each school. The State Board of Education was also named in the complaint. The schools ask us to decide the ownership of personal property used

---

[1] Appellants are the governing authorities of Hope Academy Broadway Campus, Hope Academy Chapelside Campus, Hope Academy Lincoln Park Campus, Hope Academy Cathedral Campus, Hope Academy University Campus, Hope Academy Broad Street Campus, Life Skills Center of Cleveland, Life Skills Center of Akron, Hope Academy West Campus, and Life Skills Center Lake Erie.

[2] Appellees are White Hat Management, L.L.C.; WHLS of Ohio, L.L.C.; HA Broadway, L.L.C.; HA Chapelside, L.L.C.; HA Lincoln Park, L.L.C.; HA University, L.L.C.; HA Cathedral, L.L.C.; HA High Street, L.L.C.; HA Brown Street, L.L.C.; LS Cleveland, L.L.C.; LS Akron, L.L.C.; HA West, L.L.C.; and LS Lake Erie, L.L.C.

by White Hat in the schools' daily operations. White Hat claims the right to retain the disputed property unless the schools make certain payments to the management companies as set forth in the contracts.

{¶ 2} Although, as will be seen, the wisdom of the buy-back term can be questioned, we hold that the term is enforceable and that this case must be returned to the trial court for an inventory of the property and its disposition according to the contracts. We rule narrowly on the issues before us, leaving public-policy matters to the General Assembly.

## II.     The Background of the Litigation

{¶ 3} As permitted by statute, *see* R.C. 3314.03, the governing authority of each school entered into an individual management agreement ("the contracts") in November 2005 with one of the ten named education-management organizations owned by White Hat. Each contract was substantially identical.

{¶ 4} Under the contracts, White Hat was paid either 95 or 96 percent of the revenue per student funding that the school received from the State of Ohio Department of Education pursuant to R.C. Title 33 and other applicable statutes. This fixed amount, sometimes characterized as a per-pupil payment, was known in the contract as the "Continuing Fee." In addition, all federal, state, and local government education grants were to be paid to White Hat.

{¶ 5} In return, White Hat agreed to provide all functions relating to the provision of the White Hat educational model and the day-to-day management and operation of the schools. The schools retained the right to perform their own accounting, financial reporting, and audit functions, but White Hat was responsible for most other aspects of the operation of the schools, including providing a facility, meeting all staffing and academic needs, and purchasing all furniture, computers, books, and other equipment.

{¶ 6} The various management contracts ran from November 1, 2005, until June 30, 2007, and provided for automatic renewal thereafter for consecutive

one-year terms through June 30, 2010, unless terminated for cause. The schools did not perform well under White Hat's management. Of the ten original schools, as of the 2010-2011 school year, two Hope Academies had been shut down by the Department of Education due to academic failure and three were on "academic watch"; one of the Life Skills Centers was on academic watch and second was on "academic emergency" (one step away from shut-down). This poor performance caused the schools to raise several issues, including how White Hat spent the money it received to operate the schools. Financial information revealed that White Hat spent money to purchase buildings ultimately owned by or renovated for the benefit of its own affiliates. According to the schools, although White Hat used part of the continuing fee to purchase personal property for use in the schools, it improperly titled that property in its own name.

{¶ 7} The governing authorities of the schools filed the instant lawsuit on May 17, 2010, after White Hat refused to provide further information concerning the use of alleged public funds. The complaint sought declaratory and injunctive relief, an accounting, and damages for breach of contract and breach of fiduciary duty. As part of their allegations, the schools disputed White Hat's claim of entitlement to all property White Hat purchased using public funds. Specifically, the schools challenged the operation of Section 8.a.i of the contracts, which stated that the schools could retain personal property owned by White Hat after termination of the contracts only by "paying to [White Hat] an amount equal to the 'remaining cost' basis of the personal property on the date of termination."

{¶ 8} After the action was filed, the parties executed a series of interim or "standstill" management agreements, which permitted them to continue operations as if the contracts were still in effect. On February 21, 2012, the schools filed a motion for partial summary judgment, asking the court to declare the property rights of the parties under the terms of their contracts and applicable laws.

4

{¶ 9} On May 11, 2012, the trial court granted the motion in part and denied it in part. The court upheld the contract term that required the schools to pay White Hat an amount equal to the "remaining cost basis" before obtaining the personal property titled in White Hat's name. It also upheld the schools' right to assume existing leases or to enter into new leases of facilities owned by White Hat at fair market value.[3] The trial court granted the schools' motion for a Civ.R. 54(B) certification and found that there was no just reason for delay.

{¶ 10} The schools appealed. The Tenth District Court of Appeals affirmed the trial court's judgment and held that the continuing fee paid to White Hat lost its nature as "public funds" once the funds came into White Hat's possession and control. *Hope Academy Broadway Campus. v. White Hat Mgt.*, *L.L.C.,* 10th Dist. Franklin No. 12AP-496, 2013-Ohio-5036, ¶ 24. The appellate court held that the contract was unambiguous and that it conferred on White Hat the authority to require the schools to buy back any personal property purchased by White Hat using the continuing fee. The court also stated that there was "no formal general fiduciary duty created by the agreements that required White Hat to purchase and hold property for the schools' benefit." *Id.* at ¶ 39.

### III.    Issues Before This Court

{¶ 11} We accepted the schools' appeal on three propositions of law, summarized as follows:   (1) Public funds paid to a private entity exercising a governmental function, such as the operation of a community school, retain their character as public funds even after they are in the possession and control of the private entity; (2) When a private entity operating a community school uses funds designated by the Ohio Department of Education for the education of public-

---

[3] White Hat also appealed several discovery rulings to the Tenth District Court of Appeals. *See Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.,* 10th Dist. Franklin No. 12AP-116, 2013-Ohio-911. We declined to accept White Hat's discretionary appeal from the Tenth District's decision. 136 Ohio St.3d 1452, 2013-Ohio-3210, 991 N.E.2d 258.

school students to purchase furniture, computers, software, equipment, and other personal property for the school, the private entity is acting as a purchasing agent and the property must be titled in the name of the community school; (3) A private entity that agrees to operate all functions of a community school has a fiduciary relationship with the community school. 138 Ohio St.3d 1448, 2014-Ohio-1182, 5 N.E.3d 666.

{¶ 12} While we affirm that portion of the judgment of the court of appeals that upheld the buy-back provision as enforceable against the schools, we reverse the judgment of the court of appeals on the issue of the existence of a fiduciary relationship between the parties. We hold that an entity that manages the daily operations of a community school pursuant to a contract with the school's governing authority is an "operator" within the meaning of R.C. 3314.02(A)(8)(a). We also hold that a management company that undertakes daily operation of a community school has a fiduciary relationship with the community school it operates. Because the management company of a community school is performing a traditional government function, that fiduciary relationship between the company and its community school is implicated when the company spends public funds to purchase personal property for use in the school it operates. We therefore affirm in part and reverse in part the judgment of the Tenth District Court of Appeals and remand this case to the trial court for further proceedings.

### IV. Legal Analysis

{¶ 13} A brief overview of relevant legislation is needed to place this dispute in context.

*Community-School Legislation: R.C. Chapter 3314*

{¶ 14} Community-school legislation became effective in 1997 when the General Assembly enacted R.C. Chapter 3314, titled the Community Schools Act. Am.Sub.H.B. No. 215, 147 Ohio Laws, Part I, 909, 1187. The General Assembly declared that its purposes in enacting this chapter included "providing parents a

choice of academic environments for their children and providing the education community with the opportunity to establish limited experimental educational programs in a deregulated setting." *Id.,* Section 50.52, Subsection 2(B), 147 Ohio Laws, Part I, 2043.

{¶ 15} We upheld the statutes as constitutional and held that community schools are part of Ohio's public school system. *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.,* 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, syllabus, and ¶ 32. *See also* R.C. 3314.01(B) ("A community school created under this chapter is a public school * * *"). We also recognized that educational policy decisions are within the purview of the General Assembly. *Id.* at ¶ 73. Since its enactment, R.C. Chapter 3314 has been amended repeatedly. Yet, as this case shows, many aspects remain unchanged.

{¶ 16} The legislation establishing community schools distinguishes among three types of entities: sponsors, governing authorities, and operators. These terms should be closely examined to more fully understand R.C. Chapter 3314.

*Sponsors*

{¶ 17} The community school operates under a contract with a "sponsor" that monitors the school's performance according to state laws and regulations. R.C. 3314.02(A)(1) and (C)(1); 3314.03(A)(4). A sponsor must first be approved and then monitored on its performance by the Ohio Department of Education. R.C. 3314.015(A)(2) and (3). It must enter into a detailed contract with the governing authority of the school, the required terms of which are set by statute. R.C. 3314.03(A)(1) through (26). The school must also submit to the sponsor a comprehensive plan for the school, R.C. 3314.03(B), which must specify certain details, such as internal financial controls and the process by which the governing authority's members will be selected in the future. R.C. 3314.03(B)(1) and (5). The sponsor must monitor the governing authority's compliance with its contract,

evaluate the community school's academic and fiscal performance, and take action if the community school fails academically or financially. R.C. 3314.03(D)(1), (2), and (5). The sponsor may suspend the operation of a community school that does not comply with its contract. R.C. 3314.07(B)(1)(c). Sponsors may receive fees of up to 3 percent of total payments for operating expenses that the school receives from the state. R.C. 3314.03(C).

*Governing authorities*

{¶ 18} A community school itself must be organized as either a "nonprofit corporation" or a "public benefit corporation" depending on when it was established. R.C. 3314.03(A)(1). Each community school must have a "governing authority," which shall consist of a board of no fewer than five individuals. R.C. 3314.03(A)(14); 3314.02(E)(1). Even though community schools are exempt from most of the state laws and regulations that apply to other public schools, *see* R.C. 3314.04, they are not free from oversight. The community school's governing authority must account to its sponsor for the school's performance, and the sponsor is, in turn, accountable to the Ohio Department of Education. *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, at ¶ 7. R.C. 3314.04 exempts community schools from the rules governing boards of education set forth in R.C. Chapter 3313, but R.C. Chapter 3314 imposes its own duties and responsibilities on community schools.

*Operators*

{¶ 19} A community school may contract "for any services necessary for the operation of the school." R.C. 3314.01(B). The governing authority of a community school has the option to hire an operator (usually a management company) to manage the day-to-day workings of the schools. *See* R.C. 3314.02(A)(8)(a); 3314.026. An operator is an entity that is distinct from a

sponsor. R.C. 3314.02(A)(1) (defining "sponsor") and 3314.02(A)(8) (defining "operator").

{¶ 20} In this case, the schools contracted with White Hat for the daily management and operation of their community schools. Yet it remains a fact that operators, unlike sponsors and governing authorities remain largely unregulated. R.C. 3314.02(A)(8) defines an "operator" as either (a) an individual or organization that manages a community school's daily operations pursuant to a contract with the school's governing authority or (b) a nonprofit organization that provides "programmatic oversight and support" to a community school pursuant to a contract with its governing authority. White Hat fits squarely within the first definition.

{¶ 21} But although the statutes define who an operator is, R.C. Chapter 3314 is largely silent on an operator's duties and its status vis-à-vis a community school's governing authority and its sponsor. Although legislation has been introduced to further amend the Community Schools Act and to provide enhanced oversight, there are currently no specific requirements for the content of the contracts between the governing authority and an operator.[4] Most of the existing statutory references to an operator are nonsubstantive.[5] While fees to *sponsors* are capped, R.C. 3314.03(C), there is no ceiling on the amount of funding that can be passed on to private operators such as White Hat. Indeed, the schools in this case transferred to White Hat nearly all of the taxpayer dollars they otherwise would have retained for the education of students.

---

[4] 2015 Sub.H.B. No. 2.
[5] *See, e.g.,* R.C. 3314.05(B)(2)(a) (referring to contracts between operators and governing authorities); 3314.026 (outlining method for terminating operator contracts); and 3314.092 (setting forth duty of operator to consult with school district regarding transportation before revising school schedules).

*Position of the Parties*

**{¶ 22}** Now that their contracts have terminated, the parties dispute ownership of the personal property that was used in the schools' daily operations during the lives of the contracts.[6] The schools argue that operating a community school for public-school students is a governmental function and that White Hat should be accountable for the public funds it received because these funds remain public even after they were transferred to White Hat's possession. The schools also contend that funds designated for educating public-school students must be used for the schools' benefit and that a private entity operating a community school has a fiduciary relationship with that school.

**{¶ 23}** White Hat responds that the General Assembly has already provided for accountability by requiring White Hat to submit detailed financial accounts for inclusion in the community school's financial statements, which are subject to audit. R.C. 3314.024. White Hat argues that funds do not retain their public character after they have been received by the party being paid. White Hat also emphasizes that community-school legislation expressly contemplates that the parties will negotiate their respective duties and privileges in an enforceable contract and that its contracts state that the operator is an independent contractor rather than an agent or fiduciary.

**{¶ 24}** We now examine the contract terms that relate to this dispute over personal property used in the schools.

*The Contract Language*

**{¶ 25}** Section 2 of the contract sets out the services that White Hat must provide the schools. Subsection 2.b.i (subtitled "Equipment") states:

---

[6] "Personal property" is defined as "[a]ny movable or intangible thing that is subject to ownership and not classified as real property." *Black's Law Dictionary* 1412 (10th Ed.2014).

The Company [i.e., the relevant White Hat subsidiary-operator] shall purchase or lease all furniture, computers, software, equipment and other personal property necessary for the operation of the School. Additionally, *the Company shall purchase on behalf of the School* any furniture, computers, software, equipment, and other personal property *which, by the nature of the funding source,* must be titled in the School's name.

(Emphasis added.)

{¶ 26} Section 8 provides for payment of fees and defines the "continuing fee" as either 95 or 96 percent (depending on the school) "of the revenue per student received by the School from the State of Ohio Department of Education" and certain other payments paid to the school by government sources. Section 8.a.i then provides that all costs incurred in providing the White Hat educational model shall be paid by White Hat, including the cost of purchasing books, computers, equipment, and other property for use in the schools. The source of funds for those purchases is, of course, the continuing fee, i.e., public money. In the same subsection related to payment of costs, 8.i, the contract states:

It is understood that at the School's election, upon termination of this Agreement all personal property used in the operation of the School and owned by the Company or one of its affiliates and used in the operation of the School, other than proprietary materials owned by the Company, *may become the property of the School free and clear of all liens or other encumbrances upon the School paying to the Company an amount equal to the "remaining cost basis" of the personal property on the date of termination.*

(Emphasis added.)

{¶ 27} Section 12.c of each contract again refers to the schools' obligation to pay before they may receive title to personal property used to operate the schools:

> Equipment and Personal Property. On or before the Termination Date, and *after the payment of the "remaining cost basis" to be made by the School in accordance with Section 8(a), herein* the Company shall transfer title to the School, or assign to the School the leases (to the extent such leases are assignable), for any and all computers, software, office equipment, furniture and personal property used to operate the School, other than the Company's proprietary materials.

(Emphasis added.)

{¶ 28} The schools maintain that the contract cannot be interpreted to require them, upon termination of the contract, to buy back the personal property used in the schools' operation. The schools point to the phrase from Section 2.b.i: "the Company shall purchase on behalf of the School any * * * personal property *which, by the nature of the funding source,* must be titled in the School's name." When the nature of the funding source is public, title of the property must reside in the schools.

{¶ 29} White Hat counters that this interpretation renders meaningless the contractual requirement that White Hat purchase the personal property. It claims that the funding source referred to was "usually a grant," which requires the property to be titled in the schools' name.

{¶ 30} But nothing in the contract defines the "nature of the funding source" or clarifies when the nature of the funding source requires that the schools

have title to the purchased property. The provision creates a certain amount of uncertainty on the issue of who owns the personal property used in the schools after the contracts have terminated. Did the funds used to purchase the personal property lose their public character once transferred to White Hat, a private entity?

*Public funds paid to private entities*

{¶ 31} In its first proposition of law, the schools seek a broad statement that public funds retain their character even after being paid to a private entity. R.C. 117.01(C) states that "public money" means "any money received, collected by, or due a public official under color of office, as well as any money collected by any individual on behalf of a public office or as a purported representative or agent of the public office."

{¶ 32} Community schools are public schools. R.C. 3314.01(B); *Cordray v. Internatl. Preparatory School,* 128 Ohio St.3d 50, 2010-Ohio-6136, 941 N.E.2d 1170, ¶ 24. And as an entity established by the laws of this state for the exercise of a function of government, namely education, a community school is a public office. *Id.;* R.C. 117.01(D). We outlined the framework for determining "public official" status in *Cordray,* in which we decided that the treasurer of a community school was a public official obligated to account for and disburse public funds. We explained that a "public official" is " 'any officer, employee, or duly authorized representative or agent of a public office.' " *Id.* at ¶ 19, quoting R.C. 117.01(E). We then confirmed that any "duly authorized representative or agent" of a community school, therefore, is a "public official." *Id*. at ¶ 24.

{¶ 33} The public funds received by a community school from the Department of Education are "received or collected" under color of office. *Cordray,* ¶ 27. When those funds are transferred directly to an operator, they are also public funds "received or collected" under color of office to the extent that those funds are used to perform a governmental function. While we cannot

broadly hold that public funds always retain their status as public funds, a private entity such as White Hat engaged in the business of education is accountable for the manner in which it uses public funds. Free public education, whether provided by public or private actors, is historically an exclusive governmental function.

{¶ 34} The contracts contemplate that funds designated by the Ohio Department of Education for the education of public-school students will be used for the benefit of public schools and not their private operators. The personal property at issue in this case, which includes furniture, computers, software, and other equipment, is essential for the schools to carry out the governmental function of providing an education to Ohio's children. The notion that the schools would knowingly transfer their funds to White Hat for White Hat to purchase the property for itself (and then later require the schools to buy the property back with additional public funds) does not seem supportable but was an agreed-upon term.

{¶ 35} We interpret the contract between the schools and White Hat as we interpret contracts between individuals, " 'with a view to ascertaining the intention of the parties and to give it effect accordingly, if that can be done consistently with the terms of the instrument.' " *S&M Constructors, Inc. v. Columbus,* 70 Ohio St.2d 69, 71, 434 N.E.2d 1349 (1982), quoting *Hollerbach v. United States,* 233 U.S. 165, 171-172, 34 S.Ct. 553, 58 L.Ed. 898 (1914). We have consistently explained that parties may contract for the terms they want, and the "intent of the parties is presumed to reside in the language they chose to use in their agreement." *Graham v. Drydock Coal Co.,* 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996).

{¶ 36} Common words in a contract are given their plain and ordinary meaning, unless another meaning is clearly evident from the face or overall content of the contract, or unless the result is manifestly absurd. *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two

of the syllabus. Courts apply clear and unambiguous contract provisions without regard to the relative advantages gained or hardships suffered by the parties. *Dugan & Meyers Constr. Co., Inc. v. Ohio Dept. of Adm. Servs.,* 113 Ohio St.3d 226, 2007-Ohio-1687, 864 N.E.2d 68, ¶ 29, quoting *Ohio Crane Co. v. Hicks*, 110 Ohio St. 168, 172, 143 N.E. 388 (1924).

{¶ 37} "It is not the responsibility or function of this court to rewrite the parties' contract in order to provide for a more equitable result. A contract 'does not become ambiguous by reason of the fact that that in its operation it will work a hardship upon one of the parties thereto.' " *Foster Wheeler Enviresponse, Inc., v. Franklin Cty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 362, 678 N.E.2d 519 (1997), quoting *Ohio Crane Co.* at 172. Unless there is " 'fraud or other unlawfulness involved, courts are powerless to save a competent person from the effects of his own voluntary agreement.' " *Dugan & Meyers* at ¶ 29, quoting *Ullmann v. May*, 147 Ohio St. 468, 476, 72 N.E.2d 63 (1947). The schools have not argued that the contracts were unconscionable, and we will not address issues not argued.

{¶ 38} The schools were represented by their own legal counsel, and they agreed to the provisions in the contracts. They may not rewrite terms simply because they now seem unfair. The contracts call for White Hat to title property in the schools' name in one situation: "the Company shall purchase on behalf of the School any furniture, computers, software, equipment, and other personal property which, by the nature of the funding source, must be titled in the School's name." Section 2.b.1. At the same time, the "property purchased by the School shall continue to be owned by the School." Section 8.a.ii.

{¶ 39} So, if the nature of the funding source was such that White Hat was required to purchase the personal property in the schools' names, that property belongs to the schools outright. But the contracts require additional payment

from the schools if they wish to obtain the other personal property that White Hat purchased.

*White Hat as a Fiduciary*

{¶ 40} The schools contend that they should not have to pay anything to White Hat for the contested personal property, claiming that in agreeing to undertake the operation of the schools, White Hat assumed a fiduciary relationship to the schools. They urge that the broad authority conferred on White Hat by the contracts to act in key matters on behalf of the schools and its control of all functions of the schools' day-to-day operations created a duty to act primarily for the benefit of the schools. The complaint alleges that the operators failed to account for the use of public funds. The complaint also alleges that White Hat improperly used public funds for other than educational purposes in violation of its fiduciary duty. White Hat, on the other hand, insists that the operators do not owe fiduciary duties, because they are not public officials. White Hat bases this argument on Section 14 of the contracts, which states that "[t]he parties hereby acknowledge that their relationship is that of an independent contractor."

{¶ 41} We first note that the parties' characterization of their relationship in the contracts is not controlling. Restatement of Agency 3d, Section 1.02; *see N & G Constr., Inc. v. Lindley,* 56 Ohio St.2d 415, 417, 384 N.E.2d 704 (1978), fn. 1.

{¶ 42} The contract between the schools and White Hat makes the operator the authorized representative of the community schools that it operates, for purposes of hiring, training, supervising, and firing staff, selecting a curriculum, purchasing equipment, maintaining academic standards, and monitoring student performance, either under the direction of the schools or subject to their approval. Clearly, pursuant to the contracts, White Hat is the "duly authorized representative" for the schools in a broad range of functions.

16

**{¶ 43}** We have defined the term "fiduciary relationship" as one "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Emp. of Pratt*, 40 Ohio St.2d 107, 115, 321 N.E.2d 603 (1974). In determining whether a fiduciary relationship has been created, the main question is whether a party agreed to act primarily for the benefit of another in matters connected with its undertaking. *Strock v. Pressnell*, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988).

**{¶ 44}** In a recent and analogous case, a federal district court in Missouri held that a fiduciary relationship existed between a charter school's board and its operator. *Renaissance Academy for Math & Science of Missouri, Inc. v. Imagine Schools, Inc.,* W.D.Mo. No. 4:13-CV-00645-NKL, 2014 WL 7267033 (Dec. 18, 2014). Applying that state's test for determining the existence of a fiduciary duty, the court concluded that a fiduciary relationship existed between the charter school and its operator. The court so held because under the terms of the operating agreement, the charter school's board was required to give the operator virtually all money and property that the board received from taxpayers. *Id.* at *3. And without the board's initial receipt of the money, the operator would not have had access to those funds. *Id.* The court found that the board placed its trust and confidence in its operator to create a successful learning environment and to manage the school's operations. In short, the operator took over the de facto persona of the school's governing authority. *Id.*

**{¶ 45}** Similarly, under Section 2 of the contracts, White Hat assumed broad authority, contracting with the schools to perform "all functions relating to the provision of the [relevant] Educational Model and the management and operation of the School in accordance with the terms of the Contract," except for certain financial functions. Section 2.b.i. of the contracts makes the operators the purchasing agent for the schools in certain situations, authorizing the operators to

17

make purchases "on behalf of" the schools and to title property in the schools' names. Certain crucial functions, such as staffing levels, recordkeeping, teacher training, and hiring and firing teachers, are entrusted to White Hat. White Hat agreed to act on behalf of the schools to help them carry out their purpose as outlined in R.C. Chapter 3314. White Hat's purpose, reflected in the contracts, was to advance the schools' interests. The schools contracted with White Hat to operate "all functions" of their day-to-day operations. It is evident that the schools have granted broad discretion to White Hat, placing special confidence and trust in the management companies and placing them in positions of superiority and influence. These are hallmarks of a fiduciary relationship. *See Pratt* at 115; *Groob v. KeyBank,* 108 Ohio St.3d 248, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 16.

{¶ 46} While it appears that a fiduciary relationship was created by the conduct of the parties, we cannot say whether a fiduciary duty was breached based on the record before us. The issue of unconscionability also invites further exploration in this case, but we may not consider issues not properly raised before us. The legislature has enacted statutes that take a laissez-faire attitude toward operators of community schools. We leave it to the General Assembly to determine whether public policy requires stiffening of the regulatory scheme governing these matters.

## V. Conclusion

{¶ 47} We hold that an entity that manages the daily operations of a community school pursuant to a contract with the school's governing authority is an "operator" within the meaning of R.C. 3314.02(A)(8)(a). We further hold that a management company that undertakes the daily operation of a community school has a fiduciary relationship with the community school that it operates. That fiduciary relationship between an operator and its community school is

implicated when the company uses public funds to purchase personal property for use in the school that it operates.

{¶ 48} We therefore affirm the judgment of the Tenth District Court of Appeals to the extent that it held that the buy-back provision of the contracts was enforceable and that the schools are obliged under that provision to pay for the personal property purchased by White Hat as described in the contract. We reverse the portion of the judgment of the Tenth District Court of Appeals on the issue of the existence of a fiduciary relationship between the parties. This case is remanded to the trial court for an inventory of the property and its disposition according to the contract terms.

Judgment affirmed in part

and reversed in part,

and cause remanded.

O'CONNOR, C.J., and WISE, J., concur in syllabus and judgment only.

KENNEDY and FRENCH, JJ., concur in judgment in part and dissent in part and concur in paragraph one of the syllabus.

O'NEILL, J., concurs in the syllabus but dissents from the opinion and judgment.

PFEIFER, J., dissents.

John W. Wise, of the Fifth Appellate District, sitting for O'DONNELL, J.

_____

**KENNEDY, J., concurring in judgment in part, concurring in paragraph one of the syllabus, and dissenting in part.**

{¶ 49} Respectfully, I concur in part and dissent in part. I agree with paragraph one of the syllabus, which merely reiterates R.C. 3314.02(A)(8)(a)'s definition of "operator" as an "organization * * * that manages the daily operations of a community school pursuant to a contract between the operator and the school's governing authority." I also concur in the judgment to the extent that

it affirms the judgment of the court of appeals.  I disagree with paragraphs two and three of the syllabus and dissent from the part of the judgment reversing the judgment of the court of appeals, although it is unclear what part of the judgment it reverses.

{¶ 50} Also, because I believe that a discussion of agency is central to the analysis, I would address the second proposition of law.  Finally, I reject the dicta of the opinion asserting that independent contractors can be fiduciaries without any agreement to that effect.  This dicta contradicts settled law and appears to be without legal significance here.  Also, as a factual matter, I do not believe that ordering an inventory is required because under the contract, the parties titled the personal property upon purchase, and there is no dispute about what is titled to whom.  I would affirm the judgment and adopt the reasoning of the court of appeals in all respects.

Facts

{¶ 51} While I agree with the recitation of the facts in the majority opinion as far as it goes, I note that the opinion pays scant attention to the sole focus of this dispute, which is the comprehensive nature of the contract between the parties.  By ignoring the contract's sweep, the majority conflates the roles of the Hope Academy and Life Skills schools (collectively, "Hope Academy"), who are the schools' governing boards, and the White Hat Management companies, who, by explicit agreement, operate as independent contractors.

{¶ 52} The terms of that agreement are not in dispute.  The contracts state that the Hope Academy governing boards are subcontracting all day-to-day management of the schools to the White Hat companies, leaving the governing boards no control over management.  Section 14 of the agreement, identified as "Relationship of the Parties," states, "The parties hereto acknowledge that their relationship is that of an independent contractor.  No employee of either party shall be deemed an employee of the other party.  Nothing contained herein shall

be construed to create a partnership or joint venture between the parties." In Section 2, the parties agree that Hope Academy will divest itself of control over school management "to the extent permitted by law." White Hat agrees to provide "all functions relating to the provision of the HOPE Academy Educational Model and the management and operation of the School * * * except for the School accounting, financial reporting and audit functions which will be performed by the designated fiscal officer hired by the Board." This language, as well as the rest of the contract, reveals that White Hat was granted full responsibility to implement Hope Academy's educational approach using White Hat's own expertise to educate students to the satisfaction of the governing board and its sponsors. Hope Academy explicitly subcontracted all management authority over the educational operations of its schools to White Hat, as allowed by R.C. 3314.01(B), reserving no control. Only a fiscal officer, as required by R.C. 3314.011, comes under Hope Academy's direct authority.

{¶ 53} However, while Hope Academy subcontracted the school's management to White Hat, the Revised Code does not authorize contracting out financial responsibility to the management company. The parties' contract, as well as R.C. 3314.011 and 3314.024, requires that financial oversight remains with the sponsors or governing board. For example, management companies, such as White Hat, providing services costing more than 20 percent of the school's gross annual revenues must "provide a detailed accounting including the nature and costs of the services it provides to the community school." R.C. 3314.024. And the school's sponsor, not an independent contractor, must make sure, through contracts executed with its governing board, that its schools comply with a broad array of state education laws to ensure effectiveness, including teacher licensing and academic and financial accountability. R.C. 3314.029(A)(1)(f), (g), (h), and (i) and 3314.03(A)(3), (4), (5), (8), (10), and (11). The law requires transparency. Every contract between a sponsor and a

governing board is filed with the state superintendent of public instruction and is available to the public on the Department of Education's website. R.C. 3314.03.

{¶ 54} The duties that White Hat undertook were comprehensive. The 16-page contract delegates all the governing board's day-to-day management duties to White Hat, including acquiring buildings, technology, and insurance, complying with all governmental requirements, and hiring and managing personnel. White Hat, not the governing board, covers the entire payroll, and the personnel are employees of White Hat. As with any other school, and as the parties agreed, operating the school required almost the full amount of government dollars allocated to the governing board.

{¶ 55} The majority suggests nefariousness when it asserts that the schools "transferred to White Hat nearly all of the taxpayer dollars they otherwise would have retained for the education of students." In fact, the Revised Code places limits only on the amount of money that *sponsors* may retain. "The total amount of * * * payments [to the sponsor] for oversight and monitoring of the school shall not exceed three percent" of revenues for operating expenses. R.C. 3314.03(C). In contrast, the Revised Code authorizes the schools to contract for services in exchange for fees, R.C. 3314.01(B), but does not limit the amounts that governing boards may pay to management companies. However, the governing boards' resources are limited by statute. R.C. 3314.08(C).

{¶ 56} To be completely accurate, the governing board transferred to White Hat not only money but also responsibilities, expenses, and risk. The parties did so specifically "to implement the HOPE Academy Educational Model," which Hope Academy apparently devised but did not have the expertise or resources to implement. Contrary to the innuendo of the majority, the parties' agreement did not diminish the amount of funds dedicated to "the education of students" because Hope Academy did not retain any responsibility for educating students.

**{¶ 57}** The only issue now is whether that part of the contract between the parties addressing ownership of property is void.

**{¶ 58}** A complete recitation of the propositions of law will bring these matters into sharper focus.

Proposition of Law I

**{¶ 59}** Proposition of law I, which was not presented to the court of appeals as an assignment of error, reads as follows:

Public funds paid to a private entity exercising a government function, such as the operation of a community school, retain their character as public funds even after they are in the possession and control of the private entity. Although the private entity may earn a profit out of the public funds, such profit is earned only after the private entity has fully discharged its contractual, statutory, and fiduciary obligation.

**{¶ 60}** As a preliminary matter, I do not take the second sentence of this or the third proposition to suggest that our holding must apply uniquely to for-profit entities. The majority should make clear that funds transferred pursuant to a valid contract are earned according to the terms of that contract, regardless of whether the contracting entities operate for profit.

**{¶ 61}** Otherwise, the proposition is easily rejected. *State ex rel. Oriana House, Inc. v. Montgomery*, 108 Ohio St.3d 419, 2006-Ohio-1325, 844 N.E.2d 323, cited by Hope Academy, does not support its position. That case merely holds that the state auditor may audit private entities receiving public funds. *Id.* at ¶ 1, 27. It does not hold that a private company can never retain property titled in its name when the property is purchased with public funds. *Oriana House* does state that "[i]ndividuals or entities have a duty to account for their handling of

those funds," *id.* at ¶ 13, but accountability is not the issue here. At most, *Oriana House* can be cited for the proposition that when a private entity receives public funds to perform a government function, it is *subject to audit* by the state auditor. *Id.* at ¶ 15. White Hat acknowledges that it is subject to audit under R.C. 3314.024 and that it has, in fact, been audited.

{¶ 62} In addition, Hope Academy cites no binding authority that actually supports its statement that public funds do not automatically lose their public character when they are transferred to a private entity. By contrast, White Hat cites authority very much on point. In *State ex rel. Yovich v. Cuyahoga Falls City School Dist Bd. of Edn.*, 10th Dist. Franklin No. 91AP-1325, 1992 WL 142263, *2 (June 23, 1992), the court held that public funds "lost their chief characteristic of 'public funds' once the funds came into possession and control of * * * a private entity." The funds here, like those in *Yovich*, were initially public, but were used by a public entity to pay a private entity for services rendered to a school, and the private entity used those funds to pay the persons actually rendering the service. And like the funds in *Yovich,* the funds in this case were spent by a private corporation "whose funds were not controlled or held by" the public entity. *Id.* The court in *Yovich* then "reject[ed] the contention that [the provider of the service] was paid with public funds." *Id.* Hope Academy offers nothing persuasive in support of a different result.

{¶ 63} The majority invokes *Cordray v. Internatl. Preparatory School*, 128 Ohio St.3d 50, 2010-Ohio-6136, 941 N.E.2d 1170, ¶ 25, to claim that White Hat was receiving public funds from Hope Academy "under color of office." Therefore, according to the majority, the buy-back provision of the contract "does not seem supportable," although it was "an agreed-upon term." However, as recited above, Hope Academy has its own fiscal officers, and White Hat and Hope Academy agreed that White Hat is an independent contractor. Nor, as I discuss under the next proposition of law, does White Hat fit the legal definition

of "agent" for such schools. Therefore, White Hat cannot be receiving public funds "under color of office" in any way that would put the legitimacy of the contract into question.

{¶ 64} Notwithstanding my concerns about the majority's analysis of the first proposition of law, I concur in its ultimate holding that the parties legitimately agreed that White Hat would own all property that it purchased with the money that Hope Academy provided as the continuing fee. As the majority concludes, the contract is enforceable.

Proposition of Law II

{¶ 65} The majority does not address Hope Academy's second proposition of law, but it is central to a full analysis of whether *Cordray* is relevant. Therefore, it should be addressed. Proposition of law II reads as follows:

> When a private entity uses funds designated by the Ohio Department of Education for the education of public-school students to purchase furniture, computers, software, equipment, and other personal property to operate a community school, the private entity is acting as a purchasing agent and the property must be titled in the name of the community school.

{¶ 66} I note first that this proposition applies only to property that White Hat bought with the continuing fee. White Hat essentially concedes that it operated as a purchasing agent when it used grant money to purchase property that had to be titled in the schools' name.

{¶ 67} I begin with long-standing tenets of principal-agency law. First, a principal-agency relationship is created by agreement:

25

(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.

(2) The one for whom action is to be taken is the principal.

(3) The one who is to act is the agent.

Restatement of the Law 2d, Agency, Section 1 (1958). However, the parties agreed in their contract that White Hat was an independent contractor. An "independent contractor" is defined as follows:

An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. *He may or may not be an agent.*

(Emphasis added.) Restatement of Agency, Section 2(3). *See also Soberay Mach. & Equip. Co. v. MRF Ltd.*, *Inc.*, 181 F.3d 759, 767 (6th Cir.1999) ("[u]nder the Restatement (Second) of Agency, which Ohio has adopted, an independent contractor may also be an agent").

{¶ 68} To determine whether White Hat, an independent contractor, is also an agent, we must apply the test of *Councell v. Douglas*, 163 Ohio St. 292, 126 N.E.2d 597 (1955), paragraph one of the syllabus:

The relationship of principal and agent or master and servant is distinguished from the relationship of employer and independent contractor by the following test: Did the employer

26

retain control of, or the right to control, the mode and manner of doing the work contracted for? If he did, the relationship is that of principal and agent or master and servant. If he did not but is interested merely in the ultimate result to be accomplished, the relationship is that of employer and independent contractor.

**{¶ 69}** Review of the contract clearly shows that the governing boards conferred on the White Hat companies "all functions" relating to management of the schools, leaving the governing boards no control over management. The motive was to implement Hope Academy's educational model. However, as stated above, Hope Academy wanted no responsibility for or control over the implementation. It contracted, "to the extent permitted by law, * * * all functions relating to the provision of the HOPE Academy Educational Model and the management and operation of the School" except for fiscal matters. This language, as well as the rest of the contract, reveals that White Hat was retained to implement Hope Academy's educational approach as it saw fit. Hope Academy's interest was the "ultimate result to be accomplished," i.e., properly educating children, while subcontracting control to White Hat. Under Ohio law, then, White Hat is an independent contractor and not an agent of the governing boards.

Proposition of Law III

**{¶ 70}** Proposition of law III reads as follows:

A private entity that agrees to operate all functions of a community school has a fiduciary relationship with the community school. Although the private entity may earn a profit for the services it provides, it must act primarily for the benefit of the community school.

{¶ 71} All contracts contain an implied duty of good faith. *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443, 662 N.E.2d 1074 (1996). However, "[a] 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Emp. of Pratt*, 40 Ohio St.2d 107, 115, 321 N.E.2d 603 (1974).

{¶ 72} First, I emphatically disagree with the majority's assertion that a fiduciary duty exists between the parties here. Paragraphs two and three of the syllabus are especially confusing because they are wholly dicta, with no identified relevance to this case and therefore with uncertain application in the future. I would note that the majority's rationale actually suggests that it is Hope Academy who violated its fiduciary duty to the citizens of Ohio by foolishly subcontracting its educational duties to White Hat.

{¶ 73} The black-letter law on fiduciary relationships also contradicts the third proposition of law. First, fiduciary relationships are established by agreement. The agreement here identified White Hat as an independent contractor. "Under Ohio law, there is generally no fiduciary relationship between an independent contractor and his employer unless both parties understand that the relationship is one of special trust and confidence." *Schulman v. Wolske & Blue Co., L.P.A.*, 125 Ohio App.3d 365, 372, 708 N.E.2d 753 (10th Dist.1998). No evidence exists here that a special relationship was understood, and the parties' written agreement demonstrates otherwise.

{¶ 74} Furthermore, a fiduciary relationship cannot be created by the principal alone. "A fiduciary relationship need not be created by contract; it may arise out of an informal relationship where *both parties understand that a special trust or confidence has been reposed.*" (Emphasis added.) *Stone v. Davis*, 66 Ohio St.2d 74, 78, 419 N.E.2d 1094 (1981). Hope Academy does not identify any

agreement that a fiduciary relationship was established either in the written contract or by mutual understanding, and neither does the majority.

{¶ 75} Finally, *Renaissance Academy for Math & Science of Missouri, Inc. v. Imagine Schools, Inc.,* W.D.Mo. No. 4:13-CV-00645-NKL, 2014 WL 7267033 (Dec. 18, 2014), does not support the majority's theory. In *Renaissance,* a judge determined, after a week-long trial, that under the extremely unusual facts of that case, the charter-school management company had had a fiduciary relationship with the charter school. To reach this conclusion, the judge applied the five-factor test under Missouri law for fiduciary relationships. The first factor requires showing one dominant and one subservient mind "as a result of age, state of health, illiteracy, mental disability, or ignorance." *Id.* at *1.

{¶ 76} The evidence before the judge showed that the members of the governing board were "not qualified to run a charter school," that they were "weak and confused," and that in fact, the management company had recruited those very board members because they were weak and pliable rather than independent and dominant. *Id.* at *2. The management company obstructed the board's access to the information it needed, pressured and manipulated the board members, and exerted such complete control over the board such that there was a "surrender of independence" by the board. *Id.* at *3. The judgment was not appealed. *Renaissance* does not stand for the assertion that operators are always fiduciaries, and no one is claiming that Hope Academy is weak, incompetent, or submissive to White Hat to the point of surrender.

{¶ 77} For the above reasons, I respectfully concur in the majority opinion only to the extent that it affirms the judgment of the court of appeals.

FRENCH, J., concurs in the foregoing opinion.

_____

**O'NEILL, J., concurring in syllabus and dissenting from opinion and judgment.**

{¶ 78} I concur that a management company has a fiduciary relationship with a community school when it undertakes the daily operation of a community school. However, I dissent from the decision to uphold the contract, as it violates public policy and is unenforceable as a matter of law.

{¶ 79} Simply stated, defendant White Hat Management, L.L.C., voluntarily signed a contract that bound it as a fiduciary to two distinct entities: the taxpayers of the state of Ohio and the parents of the children who attend the community schools operated by White Hat. By contract, White Hat promised to safeguard and effectively utilize $90 million of public funds that were specifically set aside to educate the children of Ohio. And by contract, White Hat promised the children of Hope Academy that it, White Hat, would fulfill its fiduciary duty by providing a quality education for the sum of $90 million. The only part of that contract that was fulfilled was that White Hat thoroughly and efficiently received the $90 million. There has been no quality education, there has been no safeguarding of public funds, and there most certainly has been no benefit to the children.

{¶ 80} It is presumed that there are good community schools. These White Hat schools are not in that category. The record is clear: White Hat provides substandard service for outrageous fees in the name of profit. The schools in this case received more than $90 million in public money from 2007 to 2010. And their performance level as attested to by the state was consistently poor. Indeed, only two of the ten schools performed satisfactorily under state standards during that time frame.

{¶ 81} Against this backdrop of failed promises and termination for failure to deliver, a majority of this court intends to reward White Hat with the termination bonus that White Hat arranged for itself in the contract. Neither

public policy nor contract law can ever be stretched far enough to reach that preordained result.

{¶ 82} As the opinion correctly concludes, the relationship between White Hat and the schools has the legal hallmarks of a fiduciary relationship. " 'A "fiduciary relationship" is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.' " *Stone v. Davis,* 66 Ohio St.2d 74, 79, 419 N.E.2d 1094 (1981), quoting *In re Termination of Emp. of Pratt,* 40 Ohio St.2d 107, 115, 321 N.E.2d 603 (1974). As stated in the opinion, "White Hat agreed to act on behalf of the schools to help them carry out their purpose as outlined in R.C. Chapter 3314. White Hat's purpose, reflected in the contracts, was to advance the schools' interests." Opinion at ¶ 45. White Hat was responsible for the day-to-day operation of the schools. Under the contract, White Hat was responsible for providing the training and curriculum, hiring and firing staff, purchasing the equipment, and maintaining academic standards.

{¶ 83} Under what circumstances would it be permissible for a fiduciary to convert the assets of its principal to its own use? None. Under what circumstances would it be permissible to allow a trustee to award the corpus of the trust to itself? None. Yet the opinion concludes that "[w]hile it appears that a fiduciary relationship was created by the conduct of the parties, we cannot say whether a fiduciary duty was breached based on the record before us." Opinion at ¶ 46. And then, feigning powerlessness, the opinion rewards White Hat with the spoils not of its victory, but of its failure, all under the guise of contract law. This is not an enforceable contract. It is a fraudulent conversion of public funds into personal profit. That is not the relationship that was bargained for, and it is not one that this court can magically create to protect the profits of White Hat.

{¶ 84} Under the contract, the schools were required to turn over nearly 96 percent of public funds they received from the state to White Hat. It is to be

remembered that if that same amount of money had gone to a traditional public school rather than a community school, it would be inconceivable to suggest that anyone would be entitled to walk away with everything purchased using those public funds. And let's be clear here. If this contract did not exist, these public funds would remain in the public-school system, which would have then been required to have their performance monitored by the state and evaluated on an annual basis.

{¶ 85} It is irrelevant how White Hat chooses to characterize the funds received. The fact is that the money financing community schools—whether general revenue funds or grant funds—qualifies as public money under the definition in R.C. 117.01(C). This public money was used to purchase public property to educate children. The public money used to purchase the school equipment did not magically become private money simply because it was disbursed by White Hat. Indeed because White Hat was a duly authorized representative of the schools, it was acting as a public official. *See Cordray v. Internatl. Preparatory School,* 128 Ohio St.3d 50, 2010-Ohio-6136, 941 N.E.2d 1170, at ¶ 12, quoting *Crane Twp. ex rel. Salter v. Secoy,* 103 Ohio St. 258, 259-260, 132 N.E. 851 (1921). Regardless of what the contract says, whether it is ambiguous or foolishly entered into, the only way to interpret this contract to permit White Hat to keep public-school property as its own is to essentially disregard the law of Ohio.

{¶ 86} The opinion is absolutely correct. This contract does indeed permit an operator who is providing a substandard education to squander public money and then, upon termination for poor performance, reap a bonus, paid for by public money. And that is why this contract is unenforceable as a matter of public policy and contract law.

{¶ 87} The Ohio General Assembly has unequivocally stated that public money means any money received or collected by or on behalf of a public office

or representative of a public office. R.C. 117.01(C). The Ohio General Assembly has also unequivocally stated that community schools are public schools. R.C. 3314.01(B). And this court has held that a duly authorized representative of a community school is a public official and may be held *strictly liable to the state for the loss of public funds. Cordray* at ¶ 1. And this court has held that public property and public money in the hands of or under the control of public officials constitute a trust fund, for which the official as a trustee should be held responsible to the same degree as the trustee of a private trust. *Crane Twp.* at 259-260. It simply cannot be disputed that White Hat has voluntarily become a public entity distributing public funds on behalf of the taxpayers of Ohio. It is axiomatic that one who becomes a steward of public funds also becomes the guardian of those same funds. Certainly the majority would not countenance the prospect of $90 million being placed in front of a fan on the ledge of an open window. While from an educational standpoint the result would be the same, the waste of public funds in any instance cannot be woven into the fabric of Ohio public policy. Finally, this court has held that contracts that bring about results that the law seeks to prevent are unenforceable as being against public policy. *Cincinnati City School Dist. Bd. of Edn. v. Conners,* 132 Ohio St.3d 468, 2012-Ohio-2247, 974 N.E.2d 78, ¶ 17. This has been the law of Ohio until today. Until now, the public interest was not something that could be subverted or contracted away. In refusing to apply the law in this case, the opinion invalidates an extensive body of law designed to safeguard the public purse and the public interest. The failure of White Hat to properly educate these children is an outrage. Today's opinion adds insult to that injury.

{¶ 88} In all the pages of the record in this case, it remains unclear how much of the public property of the failed schools that White Hat believes it owns. Under the law it owns none. It is unfortunate, in the truest sense of the word, that these schools contracted with such a poor steward of our precious resources—our

children and our tax dollars.[7]  For that choice, the state has already paid dearly once.  Refusing to uphold the buy-back provision of this contract is neither judicial activism nor rewriting the parties' contract in order to provide a more equitable result.  Rather, it is the application of existing statutes and Supreme Court of Ohio case law to prevent theft of public property.  While freedom to contract is "as fundamental to our society as the right to write and speak without restraint," it is not unlimited. *Nottingdale Homeowners' Assn., Inc. v. Darby,* 33 Ohio St.3d 32, 36, 514 N.E.2d 702 (1987), citing *Blount v. Smith,* 12 Ohio St.2d 41, 47, 231 N.E.2d 301 (1967). The state may interfere with this right, but only in "exceptional cases where intrusion is absolutely necessary, such as promoting illegal acts." *Id.*  I reject the opinion's statement that the schools are seeking to rewrite the terms of the contract simply because they now seem unfair.  This contract provision was illegal and unenforceable ab initio, and it is this court's constitutional obligation to put an end to this tragic legal fiction.

{¶ 89} I would hold that a contract that vests title to public property purchased with public funds in a private entity violates public policy and is unenforceable as a matter of law. To do anything else rewards failure and encourages its repetition in the future in the name of profit.  I dissent.

———————————

**PFEIFER, J., dissenting.**

{¶ 90} Charter schools are a noble idea.  In theory, they rescue children from broken urban school districts and educate them in smaller settings, similar to

———————————

[7] The Akron Beacon Journal recently reported that since 2001, state auditors have uncovered $27.3 million in state tax dollars that have been improperly spent by charter schools, many run by for-profit companies.  And these same schools have produced academic results "that rival the worst in the nation." Livingston, *Charter Schools Misspend Millions of Ohio Tax Dollars as Efforts to Police Them are Privatized,* Akron Beacon Journal (May 30, 2015, updated June 3, 2015), available at http://www.ohio.com/news/local/charter-schools-misspend-millions-of-ohio-tax-dollars-as-efforts-to-police-them-are-privatized-1.596318.

private schools, where families can have direct ownership in their child's education. Unfortunately, the consensus is that the theory has miserably failed to meet the expectations, whether because of flawed legislation, ineffective management, structural defects in the for-profit school model, unmotivated students, or any number of other plausible reasons.

**{¶ 91}** This case could be little more than an academic exercise because one can only assume that much of the furniture, computers, and other educational and instructional materials at issue are now obsolete, untraceable, lost, or converted to other uses. Even so, the opinion is wrong on the merits. The key contract language is not nearly so dispositive as the opinion suggests. The contract states, among other things, that "the Company shall purchase on behalf of the School any furniture, computers, software, equipment, and other personal property which, by the nature of the funding source, must be titled in the School's name."

**{¶ 92}** The opinion has chosen to read this sentence in a way that supports the position of the companies. But that reading is not required by the language. The opinion reads the sentence such that the only items that must be titled in the school's name are those items that are required to be so titled by the funding source. That reading of the sentence is overly restrictive, ignores the fact that the companies had a fiduciary responsibility to the schools, and does not promote the intention of the parties, or in any event, not the intention of the schools.

**{¶ 93}** A better reading of this key sentence subordinates the significance of "by the nature of the funding source." This is not a restrictive term; it is more in the nature of an aside. With this understanding, the sentence essentially states that assets purchased on behalf of the school must be titled in the school's name because of the nature of the funding source.

**{¶ 94}** Moreover, the contracts in this case are plainly and obviously unconscionable. In effect, the contracts call for the public to give money to a

company to buy materials for the company to use on the public's behalf to operate a public school.  The contracts require that after the public pays to buy those materials for a public use, the public must then pay the companies if it wants to retain ownership of the materials.  This contract term is not merely unwise as the opinion would have us believe; it is extremely unfair, so unfair, in fact, as to be unconscionable.  *Black's Law Dictionary* 1757 (10th Ed.2014).  The contract term is so one-sided that we should refuse to enforce it.

**{¶ 95}** Methinks the opinion doth protest too much, going out of its way to support the insupportable.  To all but those of an unduly legalistic bent, the conclusion reached by the opinion is antithetical to common sense.

_____

Dinsmore & Shohl, L.L.P., Karen S. Hockstad, and Gregory P. Mathews; and Shumaker, Loop & Kendrick, L.L.P., James D. Colner, and Adam M. Galat, for appellants.

Barnes & Thornburg, L.L.P., C. David Paragas, Kevin R. McDermott, and Amy Ruth Ita, for appellees.

Ulmer & Berne, L.L.P., and Donald J. Mooney Jr., urging reversal for amicus curiae Ohio School Boards Association.

Benesch, Friedlander, Coplan & Aronoff, L.L.P., Martha J. Sweterlitsch, and Katherine Frech, urging affirmance for amici curiae LeadingAge Ohio, Ohio Association of Community Action Agencies, Ohio Association of Nonprofit Organizations, and Ohio Community Corrections Association.

Day Ketterer Ltd., Robert J. McBride, Maria L. Markakis, and Kristen S. Moore, urging affirmance for amicus curiae Summit Academy Management, L.L.C.

Jones Day, Chad A. Readler, and Kenneth M. Grose, urging affirmance for amicus curiae Ohio Coalition for Quality Education.

_____